Lionel Z. Glancy (#134180)
Robert V. Prongay (#270796)
**GLANCY PRONGAY & MURRAY LLP**
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile:   (310) 201-9160
Email:  rprongay@glancylaw.com

*Attorney for Plaintiff*
[Additional Counsel on Signature Page]

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID SHUPAK, derivatively on behalf of SEMPRA ENERGY and SOUTHERN CALIFORNIA GAS COMPANY,<br><br>    Plaintiff,<br><br>  v.<br><br>DEBRA L. REED, JOSEPH A. HOUSEHOLDER, STEVEN D. DAVIS, JUSTIN C. BIRD, DENNIS V. ARRIOLA, JIMMIE I. CHO, DOUG SCHNEIDER, MICHAEL M. SCHNEIDER, SCOTT FURGERSON, GEORGE MINTER, ALAN L. BOECKMANN, JAMES G. BROCKSMITH, JR., KATHLEEN L. BROWN, PABLO A. FERRERO, WILLIAM D. JONES, WILLIAM G. OUCHI, WILLIAM C. RUSNACK, WILLIAM P. RUTLEDGE, LYNN SCHENK, JACK T. TAYLOR, and JAMES C. YARDLEY,<br><br>    Defendants,<br><br>    -and-<br><br>SEMPRA ENERGY and SOUTHERN CALIFORNIA GAS COMPANY<br><br>    Nominal Defendants. | Case No.:<br><br><br>**VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT**<br><br><br>**<u>JURY TRIAL DEMANDED</u>** |

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Plaintiff David Shupak ("Plaintiff"), by and through his attorneys, submits this Verified Stockholder Derivative Complaint against the Individual Defendants (as defined herein) and alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes without limitation:   (a) review and analysis of regulatory filings made by Sempra Energy and Southern California Gas Company ("Sempra" and "SoCalGas," respectively, or the "Companies"), with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Sempra and SoCalGas; and (c) review of other publicly available information concerning Sempra and SoCalGas.

## NATURE OF THE ACTION

1.     This is a stockholder derivative action asserting claims for breach of fiduciary duty brought on behalf of nominal defendants Sempra and SoCalGas against certain officers of the Companies and members of Sempra's Board of Directors (the "Board").

2.     Sempra operates as an energy services holding company worldwide. SoCalGas, a wholly owned Sempra subsidiary, transmits, distributes, and stores natural gas.  SoCalGas serves a vast swath of California.  As of December 31, 2015, it had approximately 5.9 million customers.

3.     SoCalGas operates the Aliso Canyon underground storage facility (the "Facility"), which houses up to 80 billion cubic feet of gas and is one of the largest such reservoirs in the country.  The Facility was developed almost 80 years ago as an active gas well.  It was converted to a natural gas storage facility in the 1970s.

The Facility is less than one mile from the Los Angeles community of Porter Ranch and mere miles away from several other large neighborhoods.

4.     On or about October 23, 2015, SoCalGas discovered a massive natural gas leak (the "Leak") at the Facility.  SoCalGas waited until October 28, 2015 to report the Leak to the general public.

5.     Over the next few months, the Leak continued to spew around one million barrels of natural gas into the air per day.  Eventually, the California State Health Department ordered Sempra to expedite leak abatement and provide temporary relocation to any residents affected.  On January 6, 2016, California Governor Jerry Brown declared a state of emergency.  The Leak was eventually capped on February 18, 2016, but not before becoming the largest methane leak in United States history.  Many affected families still have not been properly relocated and the Companies are the subject of at least 83 negligence-related class actions, a securities class action, a state action, a city action, a criminal complaint, and a federal government investigation.

6.     The Individual Defendants breached their fiduciary duties of loyalty and good faith by willfully engaging in the wrongdoing as alleged herein.

7.     As a direct and proximate result of the Individual Defendants' breaches of fiduciary duties, the Companies have sustained damages as described below.

**JURISDICTION AND VENUE**

8.     Diversity jurisdiction is conferred by 28 U.S.C. § 1332.  Plaintiff and the Individual Defendants are citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

9.     This Court has personal jurisdiction over each of the Defendants because each defendant is either a corporation conducting business and maintaining operations in this District, or is an individual who is either present in this District for

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT
2

jurisdictional purposes, or has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

10.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because (i) one or more of the Defendants either resides or maintains executive offices in this District; (ii) a substantial portion of the transactions and wrongs complained of herein occurred in this District; and (iii) Defendants have received substantial compensation and other transfers of money in this District by doing business and engaging in activities having an effect in this District.

## PARTIES

11.     Plaintiff is a stockholder of Sempra, was a stockholder of Sempra at the time of the wrongdoing alleged herein, and has been a stockholder of Sempra continuously since that time.  Plaintiff is a resident of Colorado.

12.     Nominal defendant Sempra is a California corporation with its principal executive offices located at 488 8th Avenue, San Diego, California 92101.

13.     Nominal defendant SoCalGas is a wholly owned subsidiary of Sempra with its principal executive offices at 555 West Fifth Street, Los Angeles, California 90013.

14.     Defendant Debra L. Reed ("Reed") has served as Chief Executive Officer ("CEO") and a director of Sempra since June 2011.  She has served as Sempra's Chairman of the Board since December 2012.  She is also the chairman of the Board's Executive Committee.   She also served as president of Sempra subsidiary San Diego Gas & Electric ("SDG&E") from 2000 to 2010, and as President and CEO of both SDG&E and SoCalGas from October 2006 to March 2010.  Defendant Reed is named as a defendant in the securities class action based on the Leak pending in the Southern District of California.  *See Plumley v. Sempra*

1    *Energy, et al.*, 3:16 CV-00512-BEN-RBB (the "Securities Action").   Upon

2    information and belief, Reed is a citizen of California.

3         15.    Defendant Joseph A. Householder ("Householder") joined Sempra in

4    2001.   He has served as Sempra's Executive Vice President and Chief Financial

5    Officer since October 2011.   He also served as Sempra's Vice President of

6    Corporate Tax, Chief Tax Counsel, Senior Vice President, Controller, and Chief

7    Accounting Officer from 2006 to 2011.   Defendant Householder is also a defendant

8    in the Securities Action.   Upon information and belief, Householder is a citizen of

9    California.

10         16.    Defendant Steven D. Davis ("Davis") joined Sempra in 1981.   He has

11   served as Sempra's Executive Vice President of External Affairs and Corporate

12   Strategy since September 2015.   During his tenure with Sempra and its subsidiaries

13   he has served in various executive positions.   At Sempra, he has served as Senior

14   Vice President of Corporate External Affairs, Vice President of Investor Relations

15   and Corporate Communications, and Vice President of Communications and

16   Community Partnerships.   At SDG&E, he has served as President, Chief Operating

17   Officer, Chief Financial Officer, and Principal Accounting Officer.   At SoCalGas, he

18   has served as Senior Vice President of Customer Service and External Relations,

19   Chief Accounting Officer, and Chief Financial Officer.   Additionally, at Pacific

20   Enterprises (another Sempra Subsidiary), he has served as Senior Vice President,

21   Chief Financial Officer, and Senior Vice President.   Davis has been a Director of

22   SoCalGas and SDG&E since September 22, 2011.   Upon information and belief,

23   Davis is a citizen of California.

24         17.    Defendant Justin C. Bird ("Bird") joined Sempra in 2004.   Since

25   September 2014, he has served as Sempra's Vice President of Compliance and

26   Governance and Corporate Secretary.   As Vice President, Bird directs Sempra's

27   ethics and compliance programs worldwide.   He coordinates and records all Board

28

1  and committee meetings.   Upon information and belief, Bird is a citizen of

2  California.

3       18.   Defendant Dennis V. Arriola ("Arriola") has served as the chairman of

4  SoCalGas since November 2015 and CEO and President since March 2014.  He also

5  served as Chief Operating Officer of SoCalGas from June 2012 to January 2014 and

6  has previously served in a broad range of leadership roles for the Sempra family of

7  companies dating back to at least 1994.  Upon information and belief, Arriola is a

8  citizen of California.

9       19.   Defendant Jimmie I. Cho ("Cho") has served as SoCalGas's Senior

10 Vice President of Gas Operations and System Integrity since at least June 2014.

11 Prior to that, he served as Vice President of Human Resources, Diversity and

12 Inclusion for SoCalGas.  Upon information and belief, Cho is a citizen of California.

13      20.   Defendant Doug Schneider ("D. Schneider") has served as SoCalGas's

14 Vice President of Engineering and System Integrity since at least February 2014.  He

15 joined SoCalGas as an engineer in 1991 and has worked at SoCalGas in an

16 engineering role since that time except for 1997 to 2001.   D. Schneider is a

17 registered professional engineer and is responsible for gas engineering and pipeline

18 safety policies and programs.  Upon information and belief, D. Schneider is a citizen

19 of California.

20      21.   Defendant Michael M. Schneider ("M. Schneider") has served as

21 SoCalGas's Vice President of Operations Support and Chief Environmental Officer

22 since at least February 2014.  He holds the same positions at SDG&E.  In these

23 positions, he is responsible for facilities, fleet services, and environmental services

24 for both Sempra subsidiaries.  M. Schneider has served in the Sempra family of

25 Companies since at least 1994.  Upon information and belief, M. Schneider is a

26 citizen of California.

27

28
                  VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

22.     Defendant Scott Furgerson ("Furgerson") has served as SoCalGas's Vice President of Gas Operations since February 2014.  He holds the same position with SDG&E.   In his position, he oversees all aspects of gas field operations including gas distribution, transmission, storage, and gas control for SoCalGas.  Upon information and belief, Furgerson is a citizen of California.

23.     Defendant George Minter ("Minter") has served as SoCalGas's Regional Vice President of External Affairs and Environmental Strategy since at least February 2015.    In this position, he leads SoCalGas's public affairs, environmental and energy policy, community relations, and media and employee communications efforts.   Upon information and belief, Minter is a citizen of California.

24.     Defendant Alan L. Boeckmann ("Boeckmann") has served as a director of Sempra since February 2011.  He has also served as a member of the Board's Corporate Governance Committee since at least March 2012.  Upon information and belief, Boeckmann is a citizen of Nevada.

25.     Defendant James G. Brocksmith, Jr. ("Brocksmith") has served as a director of Sempra since October 2001.  He has also served as a member of the Board's Audit Committee since at least March 2012 and the Environmental, Health, Safety and Technology Committee since at least March 2014.  As a member of the Environmental, Health, Safety and Technology Committee he is responsible for overseeing the Company's programs and performance related to environmental, health, safety, and technology matters.  Upon information and belief, Brocksmith is a citizen of Florida.

26.     Defendant Kathleen L. Brown ("Brown") has served as a director of Sempra since June 2013.  She has also served as a member of the Board's Corporate Governance Committee and Environmental, Health, Safety and Technology Committee since at least March 2014.  As a member of the Environmental, Health,

Safety and Technology Committee she is responsible for overseeing the Company's programs and performance related to environmental, health, safety, and technology matters.  Brown is also the sister of California Governor Edmund Gerald "Jerry" Brown.  Governor Brown's state agency, the State of California Division of Oil, Gas and Geothermal Resources is named as a defendant in the negligence class action captioned *Cupial, et al. v. Southern California Gas Company, et al.*, Cal. Sup. Ct. No. BC604592.  Governor Brown also declared a state of emergency in the Aliso Canyon area because of the spill on January 6, 2016  This was dangerously late and was likely delayed by his familial relationship with Defendant Brown.   Upon information and belief, Brown is a citizen of California.

27.    Defendant Pablo A. Ferrero ("Ferrero") has served as a director of Sempra since November 2013.  He has also served as a member of the Board's Audit Committee and the Environmental, Health, Safety and Technology Committee since at least March 2014.  As a member of the Environmental, Health, Safety and Technology Committee he is responsible for overseeing the Company's programs and performance related to environmental, health, safety, and technology matters. Ferrero serves on several other oil and gas company boards and has over 20 years of experience in the oil and gas industry.  Upon information and belief, Ferrero is a citizen of California.

28.    Defendant William D. Jones ("Jones") has served as a director of Sempra since 1994.   He has served as chairman of the Board's Corporate Governance Committee and a member of the Audit and Executive Committees since at least March 2015.  Upon information and belief, Jones is a citizen of California.

29.    Defendant William G. Ouchi ("Ouchi") has served as a director of Sempra since June 1998.  He has served as a member of the Board's Compensation and Corporate Governance Committees since at least March 2012.  Defendant Ouchi also served on the board of AECOM with Defendant William P. Rutledge

("Rutledge") from 2003 to 2016.  Upon information and belief, Ouchi is a citizen of California.

30.    Defendant William C. Rusnack ("Rusnack") has served as a director of Sempra since 2001.  He has served as the Board's Lead Director since at least March 2007.  He has served as chairman of the Board's Compensation Committee and as a member of the Corporate Governance Committee since at least March 2012.  Upon information and belief, Rusnack is a citizen of California.

31.    Defendant Rutledge has served as a director of Sempra since 2001.  He has served as chairman of the Board's Environmental, Health, Safety and Technology Committee (formerly Environmental and Technology Committee) and a member of the Compensation Committee since at least March 2012.   As the chairman of the Environmental, Health, Safety and Technology Committee, he is responsible for overseeing the Company's programs and performance related to environmental, health, safety, and technology matters.  He also served on the board of AECOM Technology with Defendant Ouchi from 2003 to 2016.   Upon information and belief, Rutledge is a citizen of California.

32.    Defendant Lynn Schenk ("Schenk") has served as a director of Sempra since March 2008.   She has served a member of the Board's Compensation Committee since at least March 2013 and the Audit Committee and Environmental, Health, Safety and Technology Committee since at least March 2012.  As a member of the Environmental, Health, Safety and Technology Committee she is responsible for overseeing the Company's programs and performance related to environmental, health, safety, and technology matters.   Upon information and belief, Schenk is a citizen of California.

33.    Defendant Jack T. Taylor ("Taylor") has served as a director of Sempra since February 2013.  He has served as chairman of the Board's Audit Committee since at least July 2015.  He has served as a member of the Board's Environmental,

Health, Safety and Technology Committee since at least March 2014.  As a member of the Environmental, Health, Safety and Technology Committee he is responsible for overseeing the Company's programs and performance related to environmental, health, safety, and technology matters.  Upon information and belief, Taylor is a citizen of Louisiana.

34.    Defendant James C. Yardley ("Yardley") has served as a director of Sempra since May 2013.  He has served as a member of the Board's Audit Committee and the Environmental, Health, Safety and Technology Committee since at least March 2014.   As a member of the Environmental, Health, Safety and Technology Committee he is responsible for overseeing the Company's programs and performance related to environmental, health, safety, and technology matters. Upon information and belief, Yardley is a citizen of Texas.

35.    The defendants referenced above in ¶¶ 14-34 are referred to herein as the "Individual Defendants."

36.    The defendants referenced above in ¶¶ 14 and 23-34 are sometimes referred to herein as the "Director Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

37.    By reason of their positions as officers and/or directors of the Companies and because of their ability to control the business and corporate affairs of the Companies, the Individual Defendants owed Sempra and its stockholders the fiduciary obligations of good faith, loyalty, and candor and were and are required to use their utmost ability to control and manage the Companies in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Sempra and its stockholders so as to benefit all stockholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Companies owes to Sempra and its stockholders the

fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Companies and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

38.   SoCalGas is owned and controlled by Sempra.  By reason of their positions as officers of SoCalGas, defendants Arriola, Cho, Doug Schneider, Michael Schneider, Furgerson, and Minter, owed and continue to owe SoCalGas and Sempra fiduciary obligations of good faith, loyalty, and candor and were and are required to use their utmost ability to control and manage SoCalGas in a fair, just, honest, and equitable manner.  Defendants Arriola, Cho, Doug Schneider, Michael Schneider, Furgerson, and Minter were and are required to act in a manner so as not to cause harm to SoCalGas or Sempra and not in furtherance of their personal interest or benefit.

39.   The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Companies, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

40.   To discharge their duties, the officers and directors of the Companies were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Companies.  By virtue of such duties, the officers and directors of the Companies were required to, among other things:

a.   ensure that the Companies complied with their legal obligations and requirements, including acting only within the scope of their legal authority and disseminating truthful and accurate statements to the SEC, other government agencies, and the investing public and complying with all state and federal laws concerning natural gas storage and leak response;

b.   conduct the affairs of the Companies in a lawful, efficient, business-like manner so as to make it possible to provide the highest quality

performance of their business, to avoid wasting the Companies' assets, and to maximize the value of Sempra's stock;

c.     properly and accurately guide investors and analysts as to the true financial condition of Sempra at any given time, including making accurate statements about Sempra's financial results and prospects, and ensuring that the Companies maintained an adequate system of financial controls such that Sempra's financial reporting would be true and accurate at all times;

d.     remain informed as to how the Companies conducted their operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state laws; and

e.     ensure that the Companies were operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, rules, and regulations.

41.     Each Individual Defendant, as a director and/or officer, owed to Sempra and its stockholders the fiduciary duties of loyalty, good faith, and candor in the management and administration of the affairs of the Companies, as well as in the use and preservation of its property and assets.   The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Companies, the absence of good faith on their part, and a reckless disregard for their duties to Sempra and its stockholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Companies.

42.     On September 12, 2014, the Board adopted the latest amended set of corporate governance guidelines which address the Board's governance role and functions to promote the functioning of the Board and its committees and to set forth

a common set of expectations as to how the Board should perform its functions (the "Corporate Governance Guidelines").

43.     The Corporate Governance Guidelines include the following language:

1.1     Board Oversight

Sempra Energy's business and affairs are managed and all of its corporate powers are exercised under the direction of the Board of Directors.  The board functions as a collective unit to establish broad policies and to monitor the performance of the corporation and the Chief Executive Officer to whom, together with senior management, the board has delegated day-to-day business operations.

In performing their duties, directors adhere to duties of loyalty and care. They fulfill the duty of loyalty by acting in good faith and in a manner free from self-dealing and which they believe to be in the best interests of Sempra Energy and its shareholders.  They fulfill the duty of care by acting in an informed manner and with such care, including reasonable inquiry, as an ordinarily prudent person in a like position would use under similar circumstances.

*     *     *

1.3     Expectations of Directors

The Board of Directors is a vehicle for corporate policy-making, monitoring and consultation.  It functions as a collective whole rather than through the unilateral actions of individual directors who as such have no authority to represent or commit the board or Sempra Energy.

Although the board functions as a unit, board effectiveness is determined by the character, integrity, judgment, knowledge, experience, efforts and contributions of the individual directors, each fulfilling duties of loyalty and care and working constructively with fellow directors and management.  The board expects that each director will:

- Exercise diligent and constructive oversight over the corporation's business and affairs.

- Act ethically and with integrity, carefully consider the effects of individual actions (both as a member of the board and of the business community) upon the corporation and the board as a whole, and act in a manner to further the corporation's success and the effectiveness of the board and management.

- Maintain an attitude of constructive skepticism, ask relevant, incisive, probing questions and engage in direct and forthright discussions with the board and management.

- Develop and maintain a broad understanding of the corporation's business and risk profile, its strategic, financial and operating opportunities and plans, and its internal control systems and disclosure controls and procedures, including environmental, and health and safety systems and procedures.

- Develop and maintain financial literacy including an understanding of the corporation's financial statements, the basic accounting principles critical to the corporation's business and how the choice of accounting principles, and the making of judgments and estimates, affect the corporation's reported financial results.

- Generally support the board's policy and business decisions and management in carrying out these decisions and demonstrate a strong commitment to the corporation, its business plans and creating and sustaining shareholder value.

- Understand and respect the roles of the board and management and observe the confidentiality of board deliberations, corporate plans and information.

- Avoid personal or other interests that conflict or may appear to conflict with or impair the director's ability to perform his or her responsibilities, promptly inform the board of any such interests and not participate in any decision affected by such interests.

- Observe corporate policies and guidelines regarding ethical behavior, interested directors, share ownership and other policies and guidelines adopted by the board, including the Code of Business Conduct and Ethics.

- Attend in person (absent exceptional circumstances or unless the meeting is announced to be a telephonic meeting) all board meetings and all meetings of committees to which he or she is appointed, be willing to serve on all committees, actively participate in meetings, review relevant materials, prepare for meetings and for discussions with management, take advantage of orientation and continuing education opportunities and otherwise educate himself or herself to discharge effectively his or her responsibilities and the expectations of the board.

- Balance prompt action with thorough deliberations, prioritize matters requiring attention, gather sufficient information, engage in open discussion, invite differing views, evaluate the benefits and risks of various courses of action and support the acceptance of prudent business risks to permit informed and timely decision making.

- View obligations to corporate and other constituencies in light of a primary duty to the company and its shareholders.

44.   Sempra has also established a Code of Business Conduct and Ethics for Board of Directors and Senior Officers (the "Code"), which "sets forth written standards that are designed to deter wrongdoing and to promote":

- Honest and ethical conduct.

- Full, fair, accurate, timely and understandable disclosure in public communications.

- Compliance with laws, rules and regulations.

- Prompt internal reporting of violations of the code.

- Accountability for adherence to the code.

45.   The Code applies to "each member of the board of directors of Sempra Energy and to each officer of Sempra Energy and its publicly held subsidiaries."

46.   Additionally, the Code states:

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT
14

## II.    Encouraging Ethical Behavior

Directors and officers are expected to observe and to promote high standards of integrity and ethical behavior in the conduct of the company's business.  Officers should actively encourage all employees to talk to supervisors, managers or other appropriate company personnel when in doubt about the best course of action in a particular situation.  They should also actively encourage all employees to report violations of laws, rules or regulations or other unethical conduct to appropriate company personnel.   In addition they should assure employees the company will not permit retaliation for reports that are made in good faith.

*      *      *

### 3.5    Compliance with Law, Rules and Regulations

Directors and officers should endeavor to comply and to cause the company to comply with all applicable laws, rules and regulations relating to the company.  They are prohibited from buying or selling securities of the Sempra Energy Companies in violation of insider trading or other securities laws.

*      *      *

## V.    Public Communications

The company is committed to providing public information about the company that is accurate, objective, fair, relevant, timely and understandable.   The chief executive, chief financial and chief accounting officers of Sempra Energy and its publicly held subsidiaries are responsible for designing and maintaining and for evaluating the effectiveness of disclosure controls and procedures.

These controls and procedures are intended to provide reasonable assurance that required Securities and Exchange Commission filings are timely filed and that these reports and other public communications do not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements made, in the light of the circumstances under which they were made, not misleading.

**SPECIFIC DUTIES OF THE ENVIRONMENTAL, HEALTH, SAFETY AND TECHNOLOGY COMMITTEE**

47.     The Board adopted a Charter for the Environmental, Health, Safety and Technology Committee (defendants Rutledge, Brocksmith, Brown, Ferrero, Schenk, Taylor, and Yardley) on September 5, 2000.  The most recent amendments to the Charter were on November 9, 2015 (at least two weeks after the Leak had started). These amendments primarily concerned cybersecurity, but this committee is now charged with "monitor[ing] compliance with internal policies and goals as well as applicable external laws and regulations."  In the prior version, amended November 12, 2013, the committee was charged with "ensur[ing]" similar compliance.  This new duty to monitor is a step in the right direction, but greater corporate governance reforms are needed within the Companies to prevent future events like the Leak.

48.     Another entirely new provision of the updated Environmental, Health, Safety and Technology Committee Charter states:

> The Company's operational performance can affect the environment as well as the health and safety of employees and other stakeholders in the communities we serve and beyond.  Consequently this Committee's focus on environmental, health, safety and technology issues is consistent with the board's oversight role of corporate responsibility and stewardship.

49.     The Environmental, Health, Safety and Technology Committee Charter further requires the committee to perform a "review of environmental, health and safety laws, regulations and developments at the global, national, regional and local level and evaluation of ways to address these matters as part of the Company's business strategy and operations."  The members of the Environmental, Health, Safety and Technology Committee, defendants Rutledge (chair), Brocksmith, Brown, Ferrero, Schenk, Taylor, and Yardley, have additional specific duties to Sempra to oversee environmental, health, safety, and technological matters.

50.     To that end, the Environmental, Health, Safety and Technology Committee, as laid out in its charter, has the following responsibilities, among others:

- Review the status of the Company's environmental, health and safety processes, programs and performance, including processes used by the business units' subsidiary boards and the Corporate Compliance Committee to monitor compliance with internal policies and goals as well as applicable external laws and regulations.

- Review the role of the Company's Corporate Compliance Committee as well as the compliance committees at each business unit in implementing programs at each business unit.

- Review current and emerging environmental, health and safety matters, including issues raised through internal audits, and discuss the management of such risks and any related corrective actions taken by the Company.

- Report to the board on environmental, health and safety matters affecting the Company.

- Review with management the effective implementation of technology to improve environmental, health and safety performance and review effective implementation of compliance procedures relating to cybersecurity, privacy and infrastructure security.

- Review with management any fatality, serious injury or illness involving an employee, customer, contractor or third-party in connection with Company operations, facilities or projects, and discuss management's response to such events.  Review with management any material noncompliance with health, safety and environmental laws and regulations, and related notice of violations and/or fines and discuss management's response to such events.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT
17

- Review stockholder proposals related to environmental, health, safety and sustainability and recommend responses to the board on such proposals with input from management.

**SPECIFIC DUTIES OF THE AUDIT COMMITTEE**

51.     Finally, the Audit Committee Charter, adopted December 2, 2003 with its latest amendments on February 18, 2011, states that the Audit Committee of the Board (defendants Brocksmith, Ferrero, Jones, Schenk, Taylor, and Yardley) is to ensure "compliance with legal and regulatory requirements" and "will discuss with management the corporation's policies with respect to risk assessment and risk management, significant financial risk exposures and the actions management has taken to limit, monitor or control such exposures."

## SUBSTANTIVE ALLEGATIONS

**A.     BACKGROUND**

52.     Sempra was created in 1998 when Pacific Enterprises, the parent company of SoCalGas, merged with Enova Corporation, the parent company of SDG&E.  Pacific Enterprises and Enova Corporation each had histories as utility companies dating back over a century.  Today, Sempra and its various subsidiaries invest in, develop, and operate energy infrastructure, and provide gas and electrical services to customers across North and South America.

53.     The Facility is an oil field and natural gas storage facility in the Santa Susana Mountains in Los Angeles County, California.  It is north of the Porter Ranch neighborhood, a part of the City of Los Angeles.  The Facility was developed beginning in 1938 and peaked as an oil producer around 1955.  With a maximum capacity of 80 billion cubic feet and comprising 115 injection/withdrawal wells, the Facility is one of the largest natural gas reservoirs in the United States.

54.     The Facility is located less than one mile from the Los Angeles community of Porter Ranch (30,000 residents) and mere miles from other

communities, including Chatsworth (40,000 residents), Granada Hills (50,000 residents), and Northridge (60,000 residents).

55.    The Facility has been owned by SoCalGas since 1971.   One of its depleted oil and gas producing formations, the Sesnon-Frew Zone, was converted by SoCalGas into a gas storage reservoir in 1973.   Today, SoCalGas transports natural gas to the facility from other locations, then injects it underground for storage. Despite the fact that the Facility houses gas for distribution to nearly 22 million customers in the Los Angeles Basin, much of its infrastructure dates back to the 1930s and 1940s.

56.    As part of the Facility's conversion in the 1970s from oil production to oil storage, a faulty safety valve in Well SS-25 of the Sesnon-Frew Zone was removed in 1979 and never replaced.   SoCalGas told state regulators that it had replaced the safety valve, but in reality opted not to because it was not a "critical well."   Critical wells are defined by state law as those within 300 feet of homes.   The safety valve would not have prevented the Leak, but it would have been essential in stopping the fumes from the Leak from pouring into the air after the Leak began (at the latest October 23, 2015).

57.    The underground reservoir is connected to the surface via a seven inch diameter gas pipe surrounded by 11.75 inches of concrete casing.   It is likely that this casing cracked, causing a leak in the pipe.   Relying on almost 80 year-old concrete to contain one of the largest oil reservoirs in the nation in the seismically treacherous land of southern California is the epitome of a bad idea.

**B.    THE LEAK**

58.    Sometime before October 2015, a break occurred along the length of Well SS-25 in the Sesnon-Frew Zone, causing natural gas to seep into the atmosphere.   The failed well has a depth of over 8,500 feet.   The safety valve would

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

19

have been able to reroute gas from the reservoir to a relief well.  Instead the gas was able to escape through a crack in the pipe without an easy fix.  The escaping gas was comprised of methane along with numerous other toxic gases, including toluene, benzene, hydrogen sulfides, sulfur dioxide, ethylbenzene, and xylenes posing significant threats to the environment and residents of the region.

59.    Not only did the Facility house a maximum of 80 billion cubic feet of gas, but SoCalGas injected 5.7 billion cubic feet in September 2015 and was on pace to inject a similar amount in October 2015.

60.    The Companies claim to have discovered the Leak on October 23, 2015.  In stark violation of state and federal laws for widespread toxic contaminations, they neglected to disclose the Leak until October 28, 2015.  On October 23, 2015, local residents submitted numerous reports of noxious odors in the area.  During the interim, Sempra denied the leak in the press and even sent employees door-to-door in the adjoining communities informing residents that everything was okay.

61.    Residents quickly began experiencing severe symptoms of gas exposure such as neurological, gastrointestinal, and respiratory ailments, dizziness, light-headedness, nausea, vomiting, headaches, and nosebleeds.

62.    On November 19, 2015, the California State Health Department ordered Sempra to expedite leak abatement and to provide temporary relocation to any resident affected by the gas leak.  On December 4, 2015, around six weeks after it publicly acknowledged the Leak, Sempra belatedly began the slow process of constructing a relief well to cap the Leak.

63.    On February 11, 2016, the relief well intercepted the base of the leaking well and the process of plugging the well began in earnest.

64.     On February 18, 2016, after at least 118 days of one million barrels per day of natural gas escaping from the Facility and into the air, the Leak was permanently capped.  The Leak is the largest methane leak in United States history.

## C.  THE AFTERMATH

65.     After the Leak began, stories of Sempra and SoCalGas management incompetence in the buildup to the Leak began to emerge.

66.     On December 15, 2015, Rodger Schwecke, a SoCalGas executive revealed that the safety valve for Well SS-25 had been removed in 1979.  Sempra never replaced the valve despite telling officials it had in 1979, and continued to fail to do so even though five years ago it requested and obtained regulatory permission to increase rates to replace leaking valves at the Facility.  These additional funds from increased rates lined the pockets of the Companies' executives rather than the crucial pipes meant to hold in toxic gas. For instance, defendant Reed received $16,893,225 in compensation for fiscal year 2014.

67.     Following the Health Department's order to relocate the thousands of nearby residents affected by the Leak, Sempra responded in an unacceptably slow manner.  On December 22, 2015, the Los Angeles City Attorney filed an *ex parte* application for a temporary restraining order seeking to compel Sempra to improve its relocation efforts.  The City Attorney's application described situations wherein Sempra had failed to provide timely relocation, provide suitable alternative housing, properly accommodate persons with disabilities, and properly accommodate persons and families with pets.

68.     By January 6, 2016, Sempra reported in a Form 8-K filed with the SEC that approximately 2,500 households had been temporarily relocated and over 1,460 additional requests for relocation had not yet been fulfilled.

69.     Although the government eventually stepped in to force Sempra's hand in its resident relocation and leak remediation efforts, government action was likely delayed due to the Board's intimate connections with high-ranking state officials.  It is no secret that defendant Brown is California Governor Jerry Brown's sister. Defendant Brown's father, Edmund G. "Pat" Brown also served as California's governor.  Defendant Brown has also served on the Los Angeles City Board of Education and as California State Treasurer.  Defendant Schenk served as a member of the United States House of Representatives and as a member of its Energy and Commerce Committee.  Defendant Schenk also served in various positions in the cabinet of former California Governor Gray Davis, including Chief of Staff.  These and other deeply-rooted connections allowed the Board to prevent Governor Jerry Brown from declaring a state of emergency until January 6, 2016.

70.     It was not until a state of emergency was declared that schools were officially closed in the area and parents were allowed to remove their children from the classroom without disciplinary repercussions.  Prior to the state of emergency, residents of the surrounding communities have alleged in a class action a complaint that they were told by the Los Angeles Unified School District that their children would be marked absent and receive an unexcused absence if they were held out of school due to the Leak.  Further, the school district informed parents that the area schools were safe from contaminants.  *See Cupial, et al. v. Southern California Gas Company*, Los Angeles Cty. Sup. Ct., No. BC604592.

71.     On February 25, 2016, Judge Elihu M. Berle of the Los Angeles Superior Court ordered a 22-day extension of the time that SoCalGas must continue to pay for temporary relocation housing for affected residents.  The temporary housing costs the Companies around $2 million per day and will last until at least March 18, 2016.

## **DAMAGES TO SEMPRA AND SOCALGAS**

72.     As a result of the Individual Defendants' wrongful conduct, the Companies allowed the Leak to begin, failed to repair the Leak in a timely manner, failed to provide for the residents affected by the Leak in an adequate and timely manner, and disseminated false and misleading statements.  All of these actions have devastated Sempra and SoCalGas's credibility.  The Companies have been, and will continue to be, severely damaged and injured by the Individual Defendants' misconduct.

73.     Indeed, the Individual Defendants' actions as alleged herein, have subjected Sempra and SoCalGas to at least 83 negligence-related lawsuits, criminal charges, the Securities Action, several lawsuits brought by city and state agencies, and a federal government investigation.   Legal and settlement fees from these lawsuits will likely cost the Companies billions of dollars.  Sempra stated in its Form 10-K filed on February 26, 2016 that:

> The costs of defending against these civil and criminal lawsuits and cooperating with these investigations, and any damages and civil and criminal fines and other penalties, if awarded or imposed, could be significant and to the extent not covered by insurance, or if there were to be significant delays in receiving insurance recoveries, could have a material adverse effect on SoCalGas' and Sempra Energy's cash flows, financial condition and results of operations.

74.     Additionally, Sempra reported that, as of December 31, 2015, SoCalGas had expended $50 million to address the leak and mitigate the environmental and community impact.  Sempra also reported that the value of the gas lost to that date was $250 to $300 million.  On January 28, 2016, the California State Senate voted unanimously to ban SoCalGas from using 1950s era wells in Aliso Canyon until they can be certified as safe.  This will cause the Companies to expend untold monies to prove that the Facility is safe or to build new facilities for gas storage for the Los Angeles area.

75.    Moreover, these actions have irreparably damaged Sempra's corporate image and goodwill.  For the foreseeable future, Sempra will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Sempra's ability to raise equity capital or debt on favorable terms in the future is now impaired.  The Companies will also have a "black-eye" similar to that of British Petroleum after the Deepwater Horizon leak that could damage their standing in the American business community indefinitely.

## PLAINTIFF'S DEMAND AND DERIVATIVE ALLEGATIONS

76.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

77.    Plaintiff brings this action derivatively in the right and for the benefit of Sempra to redress the Individual Defendants' breaches of fiduciary duties.

78.    Plaintiff is an owner of Sempra common stock and was an owner of Sempra common stock at all times relevant hereto.

79.    Plaintiff will adequately and fairly represent the interests of Sempra and its stockholders in enforcing and prosecuting its rights.

80.    SoCalGas is a wholly-owned subsidiary of Sempra.

81.    As a result of the facts set forth herein, Plaintiff has not made any demand on the Sempra Board to institute this action against the Individual Defendants.  Such a demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

82.    At the time this action was commenced, the Board consisted of twelve directors:  defendants Reed, Boeckmann, Brocksmith, Brown, Ferrero, Jones, Ouchi, Rusnack, Rutledge, Schenk, Taylor, and Yardley (the "Director Defendants").  All

twelve members of the Board are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

**DEMAND IS FUTILE AS TO ALL DIRECTOR DEFENDANTS BECAUSE THE DIRECTOR DEFENDANTS FACE A SUBSTANTIAL LIKELIHOOD OF LIABILITY**

83.   The Director Defendants face a substantial likelihood of liability for their individual misconduct.  The Director Defendants were directors throughout the period of the leak, and as such had a fiduciary duty to protect the Companies' assets and ensure that the Companies complied with all laws and regulations.

84.   Moreover, the Director Defendants owed a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively), and to ensure that the Board's duties were being discharged in good faith and with the required diligence and due care.  Instead, the Director Defendants knowingly and/or with reckless disregard reviewed, authorized and/or caused the actions described herein to occur damaging the Companies, the environment, and the physical well-being of nearby residents.

85.   In its public filings, including Forms 10-K filed with the SEC and signed by the Director Defendants, Sempra commonly acknowledges that its natural gas storage wells are dangerous and pose significant risks to the environment and to local communities.  Further, the Forms 10-K disclose that well failures could cost the Company catastrophic amounts of money.  The Director Defendants' failure to take necessary and appropriate steps to prevent and then timely rectify the Leak has resulted in the Director Defendants facing a substantial likelihood of liability.  If the Director Defendants were to bring a suit on behalf of Sempra to recover damages sustained as a result of this misconduct, they would expose themselves to significant liability.  This is something they will not do.  For this reason demand is futile.

**DEFENDANT REED LACKS INDEPENDENCE**

86.     Sempra has conceded in its SEC filings that defendant Reed is not an independent director of the Company.   In its March 26, 2015 Proxy Statement, Sempra states that the Board conducted an annual review of the independence of the directors and director nominees and determined all directors "other than Debra L. Reed who is also an executive officer of the company" are independent.

87.     In addition to this lack of independence, Reed is not disinterested for purposes of demand futility because her principal occupation is CEO of Sempra. According to the Company's SEC filings, between 2012, 2013, and 2014, Reed received total compensation of $12,203,902, $9,792,288, and $16,893,225, respectively.

88.     Defendant Reed is also incapable of considering a demand to commence and vigorously prosecute this action because she faces a substantial likelihood of liability as she is a named defendant in the Securities Action and as a likely Doe in each of the negligence-related class actions.

**DEFENDANTS RUTLEDGE, BROCKSMITH, BROWN, FERRERO, SCHENK, TAYLOR, AND YARDLEY AS ENVIRONMENTAL, HEALTH, SAFETY AND TECHNOLOGY COMMITTEE MEMBERS ARE NOT DISINTERESTED AS THEY FACE A SUBSTANTIAL LIKELIHOOD OF LIABILITY**

89.     From the start of the Leak to the present, defendants Rutledge (chair), Brocksmith, Brown, Ferrero, Schenk, Taylor, and Yardley served as members of the Environmental, Health, Safety and Technology Committee.   Pursuant to the committee's charter, the members were and are responsible for, *inter alia*, oversight of the Companies' "compliance with internal policies and goals as well as applicable external laws and regulations."   Defendants Rutledge, Brocksmith, Brown, Ferrero, Schenk, Taylor, and Yardley breached their fiduciary duties of due care, loyalty, and good faith, because the Environmental, Health, Safety and Technology Committee, *inter alia*, allowed or permitted the Leak to occur and precipitated the Companies'

inadequate response in its aftermath, thereby injuring countless nearby residents, wasting substantial Sempra resources, and causing the Companies to expend billions of dollars in legal expenses and fines. Additionally, each of the negligence-related class actions names several "Does," with yet unknown identities, as potential defendants. It is highly likely that the members of the Environmental, Health, Safety and Technology Committee will replace those "Does" as named defendants in those lawsuits. Therefore, defendants Rutledge, Brocksmith, Brown, Ferrero, Schenk, Taylor, and Yardley each face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

### DEFENDANTS BROCKSMITH, FERRERO, JONES, SCHENK, TAYLOR, AND YARDLEY AS AUDIT COMMITTEE MEMBERS ARE NOT DISINTERESTED AS THEY FACE A SUBSTANTIAL LIKELIHOOD OF LIABILITY

90.     From the start of the leak to the present, defendants Brocksmith (chair), Ferrero, Jones, Schenk, Taylor, and Yardley served as members of the Audit Committee. Pursuant to that committee's charter, the members of the Audit Committee were and are responsible for, *inter alia*, ensuring Sempra's "compliance with legal and regulatory requirements" as well as "discuss[ing] with management the corporation's policies with respect to risk assessment and risk management, significant financial risk exposures and the actions management has taken to limit, monitor or control such exposures." Defendants Brocksmith, Ferrero, Jones, Schenk, Taylor, and Yardley breached their fiduciary duties of due care, loyalty, and good faith because the Audit Committee, *inter alia*, allowed or permitted the Company to disseminate false and misleading statements in Sempra's SEC filings, public statements and outreach, and other disclosures. Additionally, each of the negligence-related class actions names several "Does," with yet unknown identities, as potential defendants. It is highly likely that the members of the Audit Committee will replace those "Does" as named defendants in those lawsuits. Therefore,

defendants Brocksmith, Ferrero, Jones, Schenk, Taylor, and Yardley each face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

### DEMAND IS FUTILE AS TO SEVERAL DIRECTOR DEFENDANTS FOR THE FOLLOWING ADDITIONAL REASONS

91.    In addition to the lack of disinterestedness for insiders and key committee members, several directors are not disinterested for additional reasons:

a. Defendants Brocksmith and Taylor each had extensive histories at KPMG LLP prior to their board tenures at Sempra.  Defendant Brocksmith was employed by KPMG for 29 years and worked his way up to deputy chairman and Chief Operating Officer of United States operations.  Defendant Taylor was employed by KPMG for over 35 years.  Taylor Chief Operating Officer of Americas and Executive Vice Chairman of U.S. Operations from 2005 to 2010 and Vice Chairman of U.S. Audit and Risk Advisory Services from 2001 to 2005.  During their long and prosperous histories at KPMG, Brocksmith and Taylor likely developed a strong personal relationship with one another and therefore could not be disinterested when determining whether to prosecute an action against the other.

b. Similarly, defendants Ouchi and Rutledge served concurrently as directors of AECOM Technology.  Ouchi was a director of AECOM from May 2003 to March 2, 2016 and Rutledge has been a director of AECOM since November 1998.  During their tenure as directors on the boards of both AECOM and Sempra, defendant Ouchi and Rutledge have likely developed a strong personal relationship with one another and therefore could not be disinterested when determining whether to prosecute an action against the other.

**DEMAND IS FUTILE AS TO ALL DIRECTOR DEFENDANTS FOR THE FOLLOWING ADDITIONAL REASONS**

92.    If the Companies' current officers and directors are protected against personal liability for their breaches of fiduciary duties alleged herein by Directors & Officers Liability Insurance ("D&O Insurance"), they caused the Company to purchase that insurance for their protection with corporate funds, *i.e.*, monies belonging to the stockholders.  However, Plaintiff is informed and believes that the D&O Insurance policies covering the Individual Defendants in this case contain provisions that eliminate coverage for any action brought directly by Sempra or SoCalGas against the Individual Defendants, known as the "insured versus insured exclusion."

93.    As a result, if the Director Defendants were to sue themselves or certain of the officers of the Companies, there would be no D&O Insurance protection, and thus, this is a further reason why they will not bring such a suit.  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery.  Therefore, the Director Defendants cannot be expected to file the claims asserted in this derivative lawsuit because such claims would not be covered under the Company's D&O Insurance policy.

94.    Under the factual circumstances described herein, the Individual Defendants are more interested in protecting themselves than they are in protecting the Companies by prosecuting this action.  Therefore, demand on Sempra and its Board is futile and is excused.  The Companies have been and will continue to be exposed to significant losses due to the Individual Defendants' wrongdoing.  Yet, the Director Defendants have not filed any lawsuits against themselves or others who were responsible for the wrongful conduct.  Thus, the Director Defendants are

breaching their fiduciary duties to Sempra and face a sufficiently substantial likelihood of liability for their breaches, rendering any demand upon them futile.

## COUNT I

### AGAINST THE INDIVIDUAL DEFENDANTS
### FOR BREACH OF FIDUCIARY DUTY

95.    Plaintiff incorporates by reference all preceding and subsequent paragraphs as if fully set forth herein.

96.    The Individual Defendants each owed Sempra, SoCalGas, and their stockholders the fiduciary duties of loyalty, good faith, candor and due care in managing and administering the Companies' affairs.

97.    The Individual Defendants were required to exercise reasonable and prudent supervision over the management, practices, controls, and financial and regulatory affairs of Sempra and SoCalGas.

98.    The Individual Defendants breached their fiduciary duties owed to Sempra and SoCalGas and their stockholders by willfully, recklessly, and/or intentionally failing to perform their fiduciary duties.  They caused the Companies to waste valuable assets and unnecessarily expend corporate funds.  They also failed to properly oversee the Companies' business, rendering them personally liable to the Companies.

99.    Each of the Individual Defendants had actual or constructive knowledge that inadequate safety controls were in place to prevent the Leak, causing harm to the Companies, nearby residents, and the environment.  The Individual Defendants breached their fiduciary duties by knowingly causing and/or recklessly allowing the Company to make false and misleading statements regarding the extent of the Leak and its remediation as alleged herein.

100.   As a direct and proximate result of the Defendants' breaches of their fiduciary duties of loyalty, good faith, candor, and due care, as alleged herein, Sempra and SoCalGas have sustained, and continue to sustain, significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Companies.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment as follows:

A.     Declaring that Plaintiff may maintain this derivative action on behalf of Sempra and SoCalGas and that Plaintiff is a proper and adequate representative of the Companies;

B.     Awarding the amount of damages sustained by the Companies as a result of the Individual Defendants' breaches of fiduciary duties;

C.     Granting appropriate equitable relief to remedy Individual Defendants' breaches of fiduciary duties, including, but not limited to the institution of appropriate corporate governance measures;

D.     Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees and costs and expenses; and

E.     Granting such other and further relief as the Court deems just and proper.

**<u>JURY DEMAND</u>**

Plaintiff hereby demands a trial by jury.

Dated:  March 14, 2016                    **GLANCY PRONGAY & MURRAY LLP**

                                          By:  *s/ Robert V. Prongay*
                                          Lionel Z. Glancy
                                          Robert V. Prongay
                                          1925 Century Park East, Suite 2100
                                          Los Angeles, CA 90067
                                          Telephone:  (310) 201-9150
                                          Facsimile:   (310) 201-9160

                                          J. Brandon Walker
                                          Todd H. Henderson
                                          **BRAGAR EAGEL & SQUIRE P.C.**
                                          885 Third Avenue, Suite 3040
                                          New York, NY 10022
                                          Tel: 212-355-4648
                                          Fax: 212-486-0462

DocuSign Envelope ID: 3FC40617-86C2-4AD9-A10C-3CFFE02552F9

## <u>VERIFICATION</u>

I, David Shupak, hereby declare, under penalty of perjury, as follows:

1.      My name is David Shupak and I am the plaintiff in the above-captioned stockholder derivative action.   I have read the foregoing Verified Stockholder Derivative Complaint (the "Complaint") and authorized its filing.   Based upon the investigation of my counsel, the allegations in the Complaint are true to the best of my knowledge, information, and belief.

2.      I am committed to and hereby declare my intent to fairly and adequately represent the interests of Sempra Energy and its stockholders in this action.


DATED: March 8, 2016

DocuSigned by:

*David Shupak*

EEA004EFF48B4C2...

David Shupak